UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ULADZISLAU FEDAROVICH et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>MARCO RUBIO, et al.,<br><br>    Defendants. | Civil Action No. 26-00329 (CJN) |

**MOTION TO DISMISS AND**
**MEMORANDUM IN SUPPORT THEREOF**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................iii

INTRODUCTION ......................................................................................................................... 1

FACTUAL BACKGROUND......................................................................................................... 2

STATUTORY AND REGULATORY BACKGROUND............................................................... 3

LEGAL STANDARDS ................................................................................................................. 5

ARGUMENT................................................................................................................................. 6

    I.    Plaintiffs' Unreasonable Delay Claim Fails Because There is no Discretionary
        Duty With Which State Has Failed to Comply, State Has Not Failed to Take a
        Required Discrete Agency Action, They Cannot Challenge an Action Committed
        to Agency Discretion, and The Purported Delay is Not Unreasonable. ................ 6

        1.    State Has Not Failed to Take a Required Discrete Agency Action...........6

        2.    Plaintiffs' Delay Claims Fail as Challenges of an Activity Committed
              to Agency Discretion Law..............................................................................9

        3.    On the Merits, the Delay Here Is Not Unreasonable……………………11

            i.    TRAC Factors 1 and 2 ................................................................. 13

            ii.    TRAC Factor 4 .............................................................................. 14

            iii.    TRAC Factors 3 and 5 ................................................................. 15

            iv.    TRAC Factor 6.............................................................................. 16

    II.    Plaintiffs' Claims Challenging the Pause Fail Because There is No Final Agency
        Action, the Court Has Limited Authority Over Foreign Policy Matters, and
        Defendants' Application of the Pause to Plaintiffs' Visa Request is In Accordance
        With the INA....................................................................................................... 16

        1.    Plaintiffs Have Not Alleged a Final Agency Action…………………….17

        2.    Plaintiffs' First APA Claim Fails (Count II). ……………………………19

            i.    The Pause Operates Through, and Is in Accordance with, the INA………20

            ii.    The Pause Is Otherwise Consistent with State's Obligations Under the
               APA……………………………………………………………………………23

3.   Plaintiffs' Ultra Vires Claim (Count II), Fails……………………………….23

4.   The Alleged Violation of 5 U.S.C. § 706(2)(D) (Count IV) Fails……………25

5.   The Alleged Violation of the INA (Count I) Also Fails……………………..28

CONCLUSION......................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967)............................................................ 11

*Alexander v. Sandoval*, 532 U.S. 275, 286-88 (2001) ................................................... 35

*Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137 (D.C. Cir. 2011)......................................... 5

*Am. Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1110 (D.C. Cir. 1993)..... 30

*Ari Akrayi v. Dep't of State*, Civ. A. No. 22-1289 (CRC), 2023 WL 2424600 (D.D.C. Mar. 9, 2023) .................................................................................................................................. 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................... 6

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015)....... 24

*Audubon of Kan., Inc. v. Dep't of Interior*, 67 F.4th 1093 (10th Cir. 2023)................................ 13

*Babamuradova v. Blinken*, 633 F. Supp. 3d 1 (D.D.C. 2022) (Bates, J.) ...................................... 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................................. 6

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) ............................................................... 21

*Beshir v. Holder*, 10 F. Supp. 3d 165, 174 (D.D.C. 2014) .............................................. 13

*Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 52 (D.D.C. 2020) .................. 33

*City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010) .................................................................................................................................. 32

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................... 12

*Clarian Health West, LLC v. Hargan*, 878 F.3d 346 (D.C. Cir. 2017)........................................ 31

*Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330 (D.C. Cir. 2023) ........................................ 2

*Delaware Valley Reg'l Ctr., LLC v. DHS*, 678 F. Supp. 3d 73, 83 (D.D.C. 2023) ...................... 23

*Delaware Valley Regional Ctr., LLC v. DHS* likewise is instructive. 106 F.4th 1195 (D.C. Cir. 2024) .................................................................................................................................. 22

*E.B. v. Dep't of State*, 2023 WL 6141673, at *3 (D.D.C. Sept. 20, 2023) .................................. 33

*E.B. v. Dep't of State*, 583 F. Supp. 3d 58, 64 (D.D.C. 2022) ...................................................... 33

*ean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983).................................................................. 33

*Fed. Express Corp. v. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) ......................... 29

*Fiallo v. Bell*, 430 U.S. 787, 792, 793 n.5 (1977)................................................................. 36

*Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024) .............................................................. 9

*Gonzaga Univ. v. Doe*, 536 U.S. 273, 281-84 (2002)........................................................... 35

*Harisiades v. Shaughnessy*, 342 U.S. 580 588-89 (1952) ..................................................... 24

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................................... 12, 13

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192 (D.C. Cir. 1992)............................................... 6

*In re Barr Lab'ys*, 930 F.2d 72, 76 (D.C. Cir. 1991)......................................................... 19

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000) ................................................. 15

*In re Core Commc'ns, Inc.*, 531 F.3d 849 (D.C. Cir. 2008) ........................................ 8, 15, 18

*In re Ctr. for Biological Diversity*, 53 F.4th 665 (D.C. Cir. 2022)........................................ 8

*In re Nat'l Nurses United*, 47 F.4th 746 (D.C. Cir. 2022) ................................................... 8

*Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995) ................................ 24

*Jamoussian v. Blinken*, Civ. A. No. 21-10980, 2022 WL 538424 (D.N.J. Feb. 23, 2022)........... 10

*Kangarloo v. Pompeo*, 480 F. Supp. 3d 134 (D.D.C. 2020) (Nichols, J.) ............................... 9

*Karam v. Garland*, Civ. A. No. 21-0915 (CKK), 2022 WL 4598626 (D.D.C. Sept. 30, 2022)... 14

*Kewayfati v. Bondi*, 165 F. 4th 342, 346 (5th Cir. 2026).................................................... 23

*Khalili-Araghi v. Bitter*, 2023 WL 5988590, at \*5 (N.D. Cal. Sept. 13, 2023)........................... 14

*Leedom v. Kyne*, 358 U.S. 184 (1958) ........................................................................ 28

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349 (D.C. Cir. 1997) ............................................................................................................... 12

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .............................................................. 5

*Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003)...................... 18

*Memon v. Blinken*, Civ. A. No. 22-0754 (CKK), 2023 WL 1438396 (D.D.C. Feb. 1, 2023) ...... 16

*Milligan v. Pompeo*, 502 F. Supp. 3d 302, 320 (D.D.C. 2020) ........................................... 16

*Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225 (D.C. Cir. 2009) ............................ 8

*Namarra v. Mayorkas*, 924 F. Supp. 2d 1058 (D. Minn. 2013) ..................................................... 14

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ............................................................. 9, 11

*Papasan v. Allain*, 478 U.S. 265 (1986) .......................................................................................... 6

*Preston v. Ky. Consular Ctr.*, 2022 WL 3593052, at *9 (E.D. Ky. Aug. 22, 2022)..................... 14

*Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) ................................................... 34

*RCM Techs., Inc. v. DHS*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009)............................................... 23

*Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 491 (1999)........................................... 28

*Rohmeena v. Bitter*, Civ. A. No. 23-2754 (ACR), 2024 WL 3898549 (D.D.C. Aug. 22, 2024).. 17

*Saavedra Bruno v. Albright*,197 F.3d 1153 (D.C. Cir. 1999)....................................................... 12

*Sarlak v. Pompeo*, Civ. A. No. 20-0035 (BAH), 2020 WL 3082018 (D.D.C. June 10, 2020)17, 18

*Skalka v. Kelly*, 246 F. Supp. 3d 147, 153-54 (D.D.C. 2017).......................................................... 17

*Tate v. Pompeo*, 513 F. Supp. 3d 132, 150-51 (D.D.C. 2021)....................................................... 16

*Telecomms. Rsch. & Action Ctr.* ("*TRAC*") *v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) 2, 7, 15, 16, 18, 19, 20

*Thomas v. Principi*, 394 F.3d 970 (D.C. Cir. 2005) ....................................................................... 5

*Throw v. Mayorkas*, Civ. A. No. 22-5699, 2023 WL 2787222 (W.D. Wash. Apr. 5, 2023)....... 10

*Trump v. Hawaii*, 585 U.S. 667, 702 (2018)............................................................................... 24

*Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ..................................................... 33

*Varol v. Radel*, 420 F. Supp. 3d 1089 (S.D. Cal. 2019)............................................................... 19

**Statutes**

§ 1152(a)(1)(A) .................................................................................................................................. 3

§ 706(2)(A) ........................................................................................................................................ 3

28 U.S.C. § 1361................................................................................................................................ 3

5 U.S.C. § § 706(2)(A)....................................................................................................................... 3

5 U.S.C. § 555(b) ............................................................................................................................... 3

8 U.S.C. § 202(a)(1)(A)..................................................................................................................... 3

**Statutes, Regulations, Rules, and Other Authorities**

22 C.F.R. § 42.81 ............................................................................................................... 2

5 C. Wright & A. Miller, Federal Practice & Procedure § 1216 (3d ed. 2004) .............................. 5

5 U.S.C. § 555 ..................................................................................................................... 8

5 U.S.C. § 706 ................................................................................................................... 13

8 U.S.C. § 1201 ......................................................................................................... 1, 2, 5, 6

8 U.S.C. § 1202 ................................................................................................................... 5

8 U.S.C. § 1361 ................................................................................................................... 2

D.C. Cir. R. 32.1 ................................................................................................................. 7

Fed. R. Civ. P. 12 ............................................................................................................. 1, 3

Foreign Affairs Manual 504.1-3 ........................................................................................... 7

LCvR 7 ............................................................................................................................. 20

By and through their undersigned counsel, Defendants respectfully move to dismiss this action pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6).

## INTRODUCTION

"Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States[,]" and "[f]ederal courts have a very limited role to play in this process." *Patel v. Garland*, 596 U.S. 328, 331 (2022). In this action for declaratory and injunctive relief and petition for writ of mandamus, Plaintiffs challenge the Department of State's ("State") 75 country visa pause (the "Pause") implemented on January 21, 2026.  Compl. ¶ 1.

Plaintiff Fedarovich is a lawful permanent resident residing in Brooklyn, New York. Compl. ¶ 7.  Plaintiff Kavaliova is his spouse and the beneficiary of an approved family-based visa petition, citizen of Belarus, and lawful resident of Poland.  Compl. ¶ 8.  Her application is subject to the Pause because Plaintiff Kavaliova is a Belarusian national.  Compl. ¶¶ 1, 8.  Her visa has not yet been denied, and indeed, her visa interview is scheduled for May 29, 2026.  *Plaintiffs' Notice of Supplemental Fact*, ECF 18.  Plaintiffs believe that the Pause will be applied to Plaintiff Kavaliova's application resulting in indefinite refusal/hold, regardless of her individualized circumstances.  *Id*. ¶ 22.

They allege that rather than wait for a 221(g) refusal to accrue additional harm, they "bring this action as a pre-enforcement, policy-level challenge because Defendants have already adopted and communicated a definitive, binding position that immigrant visas will not be issued to nationals of affected countries during the pause, regardless of individualized circumstances." Compl. ¶ 6.  Plaintiffs seek declaratory judgment that the Pause and implementing guidance are unlawful, an order setting aside any action against Plaintiffs pursuant to those polices, an order directing Defendants to resume and complete Plaintiffs' visa processing and adjudication pursuant

to lawful bases by a date certain set by the Court, and enjoin Defendants from maintaining a 221(g) denial against Plaintiffs.  Compl.  ¶¶ 63–66.  Plaintiffs also filed a motion for preliminary injunction, which is currently pending before this Court.  While Plaintiffs are frustrated with the Pause, and indeed with communications received from NVC and State regarding the visa application, this system does not afford Plaintiffs, who have no right to a visa, the ability to prevent the Executive from executing its delegated authority.  For the same reasons outlined in Defendants' opposition to Plaintiffs' motion for preliminary injunction, this complaint should be dismissed.

*First*, Plaintiffs' claims, all purporting to seek relief in the form of mandamus, fail because no source of law imposes a mandatory, non-discretionary duty upon Defendants which State has failed to take.

*Second*, Plaintiffs' claims fail because there is no discrete agency action that a consular officer is required to take.

*Third, and lastly*, on the merits, Plaintiffs fail to plead a plausible claim of unreasonable delay under the factors set forth in *Telecommunications Research & Action Center* ("*TRAC*") *v. Federal Communications Commission*, 750 F.2d 70, 79 (D.C. Cir. 1984).  *TRAC* mandates that courts decline to grant mandamus relief if it comes at the cost of other similarly situated noncitizens.  *See Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 344 (D.C. Cir. 2023).

**FACTUAL BACKGROUND**

Plaintiffs filed suit on January 29, 2026. *See* Compl. (ECF No. 1) and filed their motion for preliminary injunction on February 5, 2026. (ECF No. 3, "Pl.'s Mot.").  They allege that the Pause is contrary to the INA's nondiscrimination provisions, 8 U.S.C. § 202(a)(1)(A) and § 1152(a)(1)(A) (Count One), arbitrary and capricious agency action in violation of 5 U.S.C. § § 706(2)(A) and (C) (Count Two). They further claim unreasonable delay in violation of 5 U.S.C. §

555(b) and § 706(2)(A) (Count Three), APA procedural violation in violation of 5 U.S.C. § 553 and § 706(2)(D) (Count Four) and mandamus relief under 28 U.S.C. § 1361 (Count Five).

Plaintiffs request an order enjoining Defendants from applying the Pause to Plaintiff Kavaliova's visa application, and mandating Defendants resume and complete her visa processing and adjudication on an individualized basis and promptly schedule any required interview and complete any lawful case-specific administrative checks, and to issue a decision within a date certain set by the Court. Compl. ¶¶ 63-66. Plaintiffs allege that the Pause has significantly affected their lives and disrupted the unification of their family. Pls.' Mot. at 6-8. On March 26, 2026, Plaintiffs received notice that Plaintiff Kavaliova's visa interview is scheduled for May 29, 2026 in Warsaw. ECF 18.

## STATUTORY AND REGULATORY BACKGROUND[1]

State Department regulations promulgated under authority of the INA provide as follows for immigrant visas: "When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa." 22 C.F.R. § 42.81(a). The INA in turn has certain provisions describing bases for refusing visa applications. One such provision, INA Section 221(g), 8 U.S.C. § 1201(g), dictates that a consular officer at a foreign post shall refuse a visa application if it appears to the consular officer from statements or papers in the application, or if the consular officer knows or has reason to believe, that the applicant is ineligible to receive a visa. INA Section 291, 8 U.S.C. § 1361, places

---

[1]    Defendants also refer the Court to pages 3–5 of their Opposition to Plaintiffs' Motion for Preliminary Injunction for a fulsome description of the applicable statutory background. ECF No. 19.

the burden on an applicant noncitizen to establish their eligibility for the requested visa to the satisfaction of the consular officer.

Because an INA Section 221(g) refusal is based on the applicant's failure to demonstrate their eligibility for a requested visa, consular officers often afford noncitizens who have been refused under that section additional administrative processes, which may generate evidence or conclusions that would cause the officer to reconsider the refusal. *See* State Dep't, Administrative Processing Information, https://perma.cc/8KGL-M4K5 (pinned Sept. 20, 2025). Notably, there is no statutory command to engage in additional administrative processes that could assist noncitizens to meet their burden to demonstrate an eligibility for a visa. Instead, the statutory scheme dictates that a consular officer must refuse a visa to a noncitizen who fails to demonstrate their eligibility for it. As noted above, that occurred here with respect to the Visa Application.

In January 2026, State announced that, effective January 21, 2026, all visa issuances to immigrant visa applicants who are nationals from 75 countries would be temporarily "paused." Concurrent with this announcement, the Secretary of State circulated a directive, "Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge" (hereinafter, the "Directive"), providing the same and instructing officers to, with certain exceptions, refuse under INA § 221(g) all immigrant visa applications for nationals from these countries. *See* Def. Opp'n to Prelim. Injunc. Ex. A. The Directive explained that State "is develop[ing] additional screening and vetting tools, policies, and operations to more accurately identify any [immigrant visa] applicant likely to become a public charge" and that, because applicants from the subject countries were at a high risk for becoming a public charge, immigrant visa issuances to them would be paused in the interim. *Id.*

## LEGAL STANDARDS

Under Rule 12(b)(1), a plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). A court may examine materials outside the pleadings as it deems appropriate to resolve the question of its jurisdiction. *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

Under Rule 12(b)(6), the Court may dismiss a Complaint where a plaintiff fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When resolving a motion to dismiss pursuant to Rule 12(b)(6), the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff. *See Iqbal*, 556 U.S. at 678. A court, however, is not required to accept conclusory allegations or unwarranted factual deductions as true. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Likewise, a court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Ultimately, the focus is on the language in the complaint and whether that sets forth sufficient factual allegations to support a plaintiff's claims for relief.

**ARGUMENT[2]**

**I.**     <u>**Plaintiffs' Unreasonable Delay Claim Fails Because There is no Discretionary Duty With Which State Has Failed to Comply, State Has Not Failed to Take a Required Discrete Agency Action, They Cannot Challenge an Action Committed to Agency Discretion, and The Purported Delay is Not Unreasonable.**</u>

Plaintiffs argue that Defendants delayed the visa application in two ways and ask that Defendants be ordered to resume and complete processing and adjudication. *See* Compl. Prayer for Relief. First, they allege that the Department failed to take required agency actions— specifically, the posting of the NVA payments and scheduling of a visa interview. Compl. ¶¶ 58, 65. Second, Plaintiffs argue that the Department will, in the future, unlawfully refuse the application under 221(g), thus further delaying the adjudication. *Id*. ¶ 65.

Any delay claim fails, however, because Plaintiffs cannot identify a clear, non-discretionary duty with which State has failed to comply. Further, their claims cannot succeed because they challenge an activity committed to agency discretion. Finally, although these failings make it unnecessary for the Court to apply the factors set forth in *Telecommunications Research & Action Center* ("*TRAC*") *v. Federal Communications Commission*, 750 F.2d 70, 79 (D.C. Cir. 1984), to dispose of this case, doing so also leads to the conclusion that there is no unreasonable delay, because a visa interview has been scheduled and a decision is imminent.

    1.   <u>State Has Not Failed to Take a Required Discrete Agency Action.</u>

Although there is no delay that Plaintiffs can speak of, they claim that State failed to take required actions, through the posting of NVC payments, and failure to schedule a visa interview. Both theories are poorly plead. To the extent that Plaintiffs are challenging a delay in scheduling

---

[2]     Defendants raise similar arguments in both their Motion to Dismiss and Opposition to Plaintiffs' Motion for Preliminary Injunction. *See* ECF No. 19. Defendants understand that, given the posture of the visa application, impending visa interview, and imminent adjudication, supplemental briefing by the parties may be required.

or adjudicating the case, there is no duty to schedule. And in any event, Plaintiff Kavaliova has been scheduled for an interview.

*Karimova* is dispositive of Plaintiffs' delay allegations. . "District courts can compel agency action only in the 'extraordinary' case when they find the official committed a 'transparent violation of a clear duty to act' and has 'unreasonably delayed the contemplated action.'" *Karimova*, 2024 WL 3517852, at *1 (citation modified; quoting *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)). Plaintiffs in suits of this type typically bring both a claim under the APA and a mandamus claim under 28 U.S.C. § 1361. On the latter, "[t]o obtain a writ of mandamus, the petitioner must show, among other things, that the agency has violated 'a crystal-clear legal duty.'" *Karimova*, 2024 WL 3517852, at *3 (citing *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022), and *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022)). "Similarly, to make out a claim of agency inaction under Section 706 of the APA, the plaintiff must 'identify a legally required, discrete act that the agency has failed to perform.'" *Karimova*, 2024 WL 3517852, at *3 (citation modified; quoting *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009)). "Those two paths to compulsory relief share a common threshold: The court may act 'only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.'" *Karimova*, 2024 WL 3517852, at *2 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted)). Indeed, because the claims are functionally identical in this circumstance, *see Kangarloo v. Pompeo*, 480 F. Supp. 3d 134, 142 (D.D.C. 2020) (Nichols, J.), Defendants address them together herein.

As an initial matter, in considering the relief Plaintiffs request—i.e., compelling Defendants to "resume and complete" the visa "processing and adjudication, Pls.' Mot. at 19—the Court should be mindful that Plaintiffs' "claims [are] not standard administrative fare. [They]

arise[] within a field that is 'vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations and the war power.'" *Karimova*, 2024 WL 3517852, at *5 (cleaned up; quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952), and citing *Goodluck v. Biden*, 104 F.4th 920, 925 (D.C. Cir. 2024) (when it comes to judicial intervention in visa decisions, "[h]istorical and contextual considerations . . . warrant restraint")). Indeed, because "any policy towards [noncitizens] is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations," such "matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades*, 342 U.S. at 588–89.

The law provides no clear duty to schedule a visa interview for any particular noncitizen, and then adjudicate their application, as many courts in this District and other districts have held. *See, e.g.*, *Avagyan v. Blinken*, Civ. A. No. 22-2643 (CRC), 2022 WL 19762411, at *4 n.2 (D.D.C. Sept. 29, 2022) (citing cases from this district); *see also Akter v. Rubio*, 805 F. Supp. 3d 37, 44 (D.D.C. 2025) (following *Avagyan*). Accordingly, Plaintiffs' unreasonable delay claims fail due to their failure to identify a clear, non-discretionary duty with which State has failed to comply. *See Hassan v. Bitter*, 748 F. Supp. 3d 722, 745 n. 3 (D. Neb. 2024) (collecting cases supporting the proposition that "overwhelming caselaw finds no nondiscretionary duty to schedule a visa interview with a consular officer exits" (internal quotation marks and citation omitted)); *see also Throw v. Mayorkas*, Civ. A. No. 22-5699, 2023 WL 2787222, at *3 (W.D. Wash. Apr. 5, 2023) ("the Court can find no statutory or regulatory obligation requiring the State Department to schedule a consular interview by a date certain"); *Jamoussian v. Blinken*, Civ. A. No. 21-10980, 2022 WL 538424, at *2 (D.N.J. Feb. 23, 2022) ("There is no such statutory or regulatory time limit with respect to a State Department consular officer's scheduling of a consular interview.").

- 8 -

Plaintiffs point to 5 U.S.C. § 555(b) as the source of a duty to schedule a visa interview and then adjudicate the application. *See* Compl. ¶¶ 28. However, as discussed above, any reliance on 5 U.S.C. § 555(b) as imposing a clear duty to act is misplaced. Section "555(b) is an ancillary provision stating that each agency shall proceed to conclude a matter presented to it with due regard for the convenience and necessity of the parties or their representatives and within a reasonable time." *Karimova*, 2024 WL 3517852*, at *3 (cleaned up; quoting 5 U.S.C. § 555(b)). Its amorphous and open-ended language hardly expresses the sort of "specific, unequivocal command" ordering "a precise, definite act about which an official had no discretion whatever" that can support mandamus or APA relief. *S. Utah*, 542 U.S. at 63 (cleaned up); *see Karimova*, 2024 WL 3517852, at *3 ("Section 555(b) does no such thing."). Indeed, as noted above, the D.C. Circuit, considering a similar circumstance in *Karimova*, rejected unreasonable delay claims premised on Section 555(b). *See id.*

2. <u>Plaintiffs' Delay Claims Fail as Challenges of an Activity Committed to Agency Discretion by Law.</u>

Plaintiffs' delay claims also fail for another independent reason—namely, the posting of NVC payments and scheduling of visa interviews are activities committed to agency discretion. Indeed, there are no meaningful statutory or regulatory standards for a court to apply to adjudge the reasonableness of allocating consular services at the multitude of posts abroad. For this independent reason, Plaintiffs' claims here fail.

The APA does not provide judicial review of agency actions in at least two circumstances: (i) when "statutes preclude judicial review"; and (ii) when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Although there is a strong presumption of reviewability under the APA, *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), agency action is deemed to be committed to agency discretion when "statutes are drawn in such broad terms that in a given

case there is no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotations omitted), or there is "no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). As the Supreme Court has stated, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action." *Id*. Also, the APA's "general applicability 'runs aground' when it comes to consular visa decisions[,]" providing further caution to courts when litigants seek review in immigration matters. *Karimova*, 2024 WL 3517852, at *6 (citing *Saavedra Bruno*, 197 F.3d at 1162).

Here, there are no statutory or regulatory provisions that provide a "meaningful standard" against which to measure the Secretary's decision-making. *See Heckler*, 470 U.S. at 831-32. Congress has given the Secretary broad, discretionary authority to "administ[er] and [] enforce[ ]" the INA, 8 U.S.C. § 1104, and to "administer, coordinate, and direct the Foreign Service of the United States and the personnel of State." 22 U.S.C. § 2651a; *see Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) ("*LAVAS*") ("[State] is entrusted by a broadly worded statute with balancing "complex concerns," "[agency] resources," and "the relative demand for visa applications"). The Secretary is responsible for over 230 U.S. missions, and must allocate consular resources to provide a broad range of important services (e.g., assistance during emergencies, processing over 110 classifications of visas). *See, e.g.*, 8 U.S.C. § 1104(a); 22 U.S.C. §§ 1731-33; *Babamuradova*, 633 F. Supp. 3d at 15 ("Interviews are scheduled based on, among other things, the capacity of the consular offices and embassies. If a post does not have capacity to interview someone . . . it cannot do so." (citation omitted)). Allocating consular services "involves a complicated balancing of a number of factors which are peculiarly within [State's] expertise." *Heckler*, 470 U.S. at 831. Indeed, such "[s]tatutory schemes

- 10 -

that instruct agencies to perform delicate balancing acts between competing policy goals rarely provide the kind of discrete, legally required action that can ground an APA failure-to-act claim." *Audubon of Kan., Inc. v. Dep't of Interior*, 67 F.4th 1093, 1109 (10th Cir. 2023).

Further, Congress granted the Secretary the discretion to set the form, manner, and place for a visa application. 8 U.S.C. § 1202(a). Granting the Secretary "the discretion to promulgate regulations governing the process of adjudication necessarily includes a grant of discretion over the pace of adjudication." *Beshir v. Holder*, 10 F. Supp. 3d 165, 174 (D.D.C. 2014). "In other words, the 'statutory grant of discretion over how' to issue visas 'necessarily carries with it the discretion to determine when those [ ] decisions will be made.'" *Karam v. Garland*, 2022 WL 4598626, at *7 (D.D.C. Sept. 30, 2022) (citation omitted). Indeed, the lack of a "congressionally-imposed deadline or timeframe to complete the adjudication of [visa] applications supports the conclusion that the pace of [scheduling visa interviews] is discretionary and thus not reviewable." *Beshir*, 10 F. Supp. 3d at 176. Accordingly, "the timing and scheduling of interviews [to make a visa application] is firmly committed to agency discretion by law." *Preston v. Ky. Consular Ctr.*, 2022 WL 3593052, at *9 (E.D. Ky. Aug. 22, 2022); *see also Khalili-Araghi v. Bitter*, 2023 WL 5988590, at *5 (N.D. Cal. Sept. 13, 2023) ("In the context of an individual visa petition that has not yet proceeded to the application stage, neither § 1202(b) nor § 42.81(a) imposes the requisite duty to schedule an interview. This result is logical, given the demands placed on 'the capacity of the consular offices and embassies.'" (quoting *Babamuradova*, 633 F. Supp. 3d at 15)). Because of this, no mandamus relief is available under the APA or otherwise.

   3.   On the Merits, the Delay Here Is Not Unreasonable.

   Even were the Court to reach the merits of the delay allegations, there is no delay Plaintiffs can speak of, because Plaintiff Kavaliova has an interview scheduled.

- 11 -

A writ of mandamus to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). "The central question in evaluating 'a claim of unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus.'" *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *TRAC*, 750 F.2d at 79). The *TRAC* six-factor governs whether agency action has been unreasonably delayed:

(1)    the time agencies take to make decisions must be governed by a rule of reason;

(2)    where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3)    delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4)    the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5)    the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6)    the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*TRAC*, 750 F.2d at 80 (citations and quotation marks omitted).

Courts in this District routinely dismiss suits such as this—which seek to compel State action on visa requests—under the *TRAC* factors. *See, e.g.*, *Dey v. Rubio*, 2025 WL 2320364, at *5 (D.D.C. Aug. 11, 2025) ("[t]here is no denying the 'troubling backlog' of visa applications and the way it disrupts the lives of so many people. . . . But under binding precedent, the Court must conclude [plaintiff] has not stated a claim that entitles him to relief" (citation omitted)); *Akrayi v. Dep't of State*, 2023 WL 2424600, at *3 (D.D.C. Mar. 9, 2023) (nearly three-year delay "falls

comfortably within the range of reasonableness"); *Memon v. Blinken*, 2023 WL 1438396, at *1 (D.D.C. Feb. 1, 2023) (34-month wait at NVC for visa interview not unreasonable).

And while any purported delay Plaintiffs are experiencing has nothing to do with the Pause, courts in this District have consistently found delays stemming from broader government policies pausing the issuance of visas not unreasonable under the *TRAC* factors. *See, e.g.*, *Tate v. Pompeo*, 513 F. Supp. 3d 132, 150-51 (D.D.C. 2021) (no unreasonable delay where delay in processing plaintiffs' O-1 and O-3 visa cases resulted from policy suspending issuance of such visas); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 320 (D.D.C. 2020) (same, for K-1 visas).

### i.    *TRAC Factors 1 and 2*

The first and second *TRAC* factors weigh in Defendants' favor. These factors ask whether the length of time for the agency to act is governed by a "rule of reason" as informed by any specific timetable established by Congress.  There is no statutory or regulatory timeframe within which State must re-adjudicate visa applications or schedule a visa applicant for an interview. "To the contrary, Congress has given the agencies wide discretion in the area of immigration processing." *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153-54 (D.D.C. 2017) (noting that a two-year delay in processing a visa "does not typically require judicial intervention"). Because Congress has established no applicable firm timetable, case law provides the guidelines to determine whether Plaintiffs' cases have been pending for an unreasonable amount of time. *See Sarlak v. Pompeo*, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020) ("Absent a congressionally supplied yardstick, courts typically turn to case law as a guide" to determine whether a delay is reasonable).

Plaintiffs' unreasonable delay claim should be dismissed. Courts in this District, including this one, have routinely concluded that delays for immigration benefits far longer than the range here do not constitute unreasonable delay.  *See, e.g.*, *Schneeberger Inc.*, *v. Dep't of State*, 2025

WL 2239271, at *4 (D.D.C. Aug. 6, 2025) (courts "have generally found that immigration delays . . . between three to five years are often not unreasonable"); *Rohmeena v. Bitter*, 2024 WL 3898549, at *3 (D.D.C. Aug. 22, 2024) (no unreasonable delay in scheduling visa interview where visa case had been pending at NVC for less than two years and 20 months since being designated "documentarily complete"; collecting cases and noting longer delays in similar cases found not unreasonable); *Skalka*, 246 F. Supp. 3d at 153-54 (citing cases that a five- to ten-year delay in the immigration context may be reasonable). These cases confirm that these initial *TRAC* factors weigh in Defendants' favor. *See Sarlak*, 2020 WL 3082018, at *6.

The factual circumstances surrounding this matter confirm that there has been no "transparent violation[ ] of a clear duty to act[,]" or delay "so egregious as to warrant mandamus." *Core Commc'ns, Inc.*, 531 F.3d at 855 (citation omitted). Indeed, "[w]hether a 'rule of reason' exists for agency action 'cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Tate*, 513 F. Supp. 3d at 148 (quoting *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)). Here, the alleged delays generally range from 34 months to a single day and the visa interview is scheduled. At that interview, the applicant will make and execute her application for a visa. The consular office will then issue or refuse the visa, in accordance with 22 CFR 42.81(a). There is no unreasonable delay.

ii.      *TRAC Factor 4*

The fourth *TRAC* factor—the effect of granting relief on the agency's competing priorities—carries significant weight, *see Mashpee Wampanoag*, 336 F.3d at 1100, and weighs heavily in Defendants' favor as Plaintiffs ask this Court to prioritize their case despite public-

charge concerns and the need for additional screening and vetting as outlined in the Directive.

Further, Plaintiffs are demanding that State adjudicate their immigrant visa cases within a date certain.  Prayer for Relief, ¶65.  A court cannot compel agency action where the result would be merely to expedite the consideration of a plaintiff's case ahead of others.  *See In re Barr Lab'ys*, 930 F.2d 72 (D.C. Cir. 1991) ("The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."); *Liberty Fund v. Chao*, 394 F. Supp. 2d 105, 117 (D.D.C. 2005) (courts will not compel agency action where result "would mean putting [plaintiff] at the head of the queue at the expense of others"). Mandamus relief is also inappropriate in this context. *See Liberty Fund*, 394 F. Supp. 2d at 117; *see also Varol v. Radel*, 420 F. Supp. 3d 1089, 1098 (S.D. Cal. 2019) ("[G]ranting relief to the Plaintiff simply moves her to the front of the line at the expense of all other applicants who may not have filed an application for mandamus relief.").

To the extent Plaintiffs attempt to argue that this case presents the adjudication of just one visa, and, thus, that it would not fundamentally recalibrate State's processing priorities if the Court were to grant the relief requested, the Court should not struggle to cast this argument aside. This *TRAC* factor nonetheless favors the government because "[w]hile the effect of an individual case would be minimal, the accumulation of such individual cases being pushed by judicial fiat to the front of the line would erode the ability of agencies to determine their priorities." *Tate*, 513 F. Supp. 3d at 150.

### iii.    TRAC Factors 3 and 5

"The third and fifth [*TRAC*] factors overlap—the impact on human health and welfare and economic harm, and the nature and extent of the interests prejudiced by the delay." *Liberty Fund*, 394 F. Supp. 2d at 118. These factors also weigh in Defendants' favor. Although Defendants

understand that Plaintiffs claim that the alleged delay has profoundly impacted their lives, advancing the applications would undermine State's admissibility concerns for immigrant visa applicants from the subject countries. Further, allowing Plaintiffs' claims here would benefit them to the detriment of other noncitizens awaiting adjudication of their visa cases, who may be experiencing the same or worse impacts from a delay. Indeed, expediting review would direct resources away from State's important need to develop additional screening and vetting tools to more accurately identify applicants likely to become a public charge, and would place these applicants at the front of the line without State having the benefit of these tools.

### iv.    TRAC Factor 6

The sixth and final *TRAC* factor provides that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC*, 750 F.2d at 80. State has explained why it is implementing the Pause—i.e., "[a]pplicants from these countries are at a high risk for becoming a public charge" thus necessitating that the agency "evaluate and enhance screening and vetting procedures and guidance related to the public charge ground of ineligibility." *Id.* ¶ 3. Although a delay in processing may be frustrating, it is not proof of impropriety or bad faith. Instead, it is consistent with State working to ensure appropriate screening and vetting, in light of informed admissibility concerns.

In view of the *TRAC* factors, Plaintiffs' delay claim cannot succeed.

**II.    Plaintiffs' Claims Challenging the Pause Fail Because There is No Final Agency Action, the Court Has Limited Authority Over Foreign Policy Matters, and Defendants' Application of the Pause to Plaintiffs' Visa Request is In Accordance With the INA.**

In Counts One, Two, and Four of their complaint, Plaintiffs challenge the Pause, alleging that the Directive violates the APA, the INA, and is ultra vires. Compl. ¶¶ 53-56, 59-60. For a variety of reasons, the Court should dismiss these allegations.

1.  Plaintiffs Have Not Alleged a Final Agency Action.

Plaintiffs' claims challenging the Pause fail because the Directive does not constitute final agency action, nor is there any other action of the Defendants herein that could be considered final. Only a "final agency action" is reviewable. 5 U.S.C. § 704. And, an agency action is final only if it (1) marks the "consummation" of the agency's decisionmaking process and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Plaintiffs assert that the Directive is final agency action, and violates the APA, 5 U.S.C. § 706(2)(A), as arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law. *See, e.g.*, Compl. ¶¶ 1012. However, the Directive fails to meet both Bennett prongs.

The Directive is an "ALDAC"—a cable communication sent by the Department of State to all diplomatic and consular posts. Def. A. ALDACs may convey State policy or instructions but are not policies or decisions themselves; rather, they simply serve as a means of communication. Under the Directive, posts are given processing instructions within an existing statutory regime: the Directive instructs posts to implement the Pause through the INA's existing refusal mechanism—§ 221(g)—and afforded discretion to continue refusing visa applications on other grounds. *Id*. The Directive itself does not grant or deny any application. *See id*.  Legal consequences arise only when a consular officer enters an individualized refusal.

Under *Bennett*, the critical question is whether the challenged action itself fixes rights or obligations. 520 U.S. at 177-78.  And finality exists where the agency action "alter[s] the legal regime" to which the plaintiff is subject and produces binding legal effects.  *Id*. at 178.  In *Nat'l Immigr. Project of Nat'l Laws. Guild v. EOIR*, for example, the court held that EOIR policies "do not constitute final agency action because they do not determine any rights or obligations, nor do

- 17 -

legal consequences flow from those policies." 456 F. Supp. 3d 16, 31 (D.D.C. 2020) ("*NIP*"). "Instead, legal consequences flow (and rights and obligations are determined) only form the particular decision of an immigration judge implementing EOIR's policies in a specific case." *Id*. The Directive is no different. Neither the Directive nor the Pause purports to alter any applicant's legal status, determine admissibility, or even compel a particular outcome in any individual case. Rather, the Directive instead operates only to provide guidance on future, case-specific adjudications conducted by consular officers under the INA. *Delaware Valley Regional Ctr., LLC v. DHS* likewise is instructive. 106 F.4th 1195 (D.C. Cir. 2024) ("*DVRC*"). There, the court considered whether statements in a USCIS policy manual, which the agency described as "contain[ing] the official policies of USICS" and "to be followed by all USCIS officers in the performance of their duties," constituted final agency action. *Id*. at 1201 n.3. The court held that they did not, reasoning that the statements did "not impose any new 'concrete consequences' . . . when considered within the context of 'the specific statute[] and regulations that govern.'" Id. at 1204-05.

Similarly, in *Avagyam*, the court found that modifications to the FAM did not constitute final agency action. 2022 WL 19762411, at *6. Despite the FAM "contain[ing] directives" and "outlining specific policies . . . regarding the issuance of visas," the Court found that the Manual "merely clarifie[d] . . . existing duties under the [statute]" and did not "bind [State] to a particular decision." *Id*.; *see also Kewayfati v. Bondi*, 165 F. 4th 342, 346 (5th Cir. 2026) (asylum application denials, alleged by plaintiffs to be "an amorphous place holder," were not final agency actions, as they merely kept the "status quo [in place] for the time being—even if for a prolonged period" and thus were not decisions "from which legal consequences . . . flow"); *RCM Techs., Inc. v. DHS*,

614 F. Supp. 2d 39, 46 (D.D.C. 2009) (policy permitting adjudicators to impose extra-statutory requirements was not final agency action, as adjudicators retained discretion under the policy).

So, too, here. Similar to the USCIS's policy manual in *DVRC* and the *FAM* in *Avagyam*, the Directive merely guides how officers conduct adjudications within an existing statutory framework. The Directive, and indeed the Pause itself, does not "create[] binding legal duties separate from, or on top of," those already in the INA itself. *Delaware Valley Reg'l Ctr., LLC v. DHS*, 678 F. Supp. 3d 73, 83 (D.D.C. 2023). Existing as such, the Directive reflects "nothing more than a statement of agency policy" that advises officers on implementation of INA requirements. *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015).

There is no agency action here. Therefore, Plaintiffs' claims fail on this basis.

2.    Plaintiffs' First APA Claim Fails (Count II).

Plaintiffs contend that the Pause violates APA , 5 U.S.C. § 706(2)(A), because it "exceeds statutory authority" and "not in accordance with law." Compl. ¶ 56; Mot. at 5. Plaintiffs are wrong.

As an initial matter, judicial review over this count—and, indeed, the remaining counts challenging the Pause—is sharply constrained by the Court's limited authority over foreign policy matters. The Supreme Court consistently has recognized that "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (internal quotation marks omitted); *see Harisiades v. Shaughnessy*, 342 U.S. 580 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry . . . ."). Plaintiffs, through these claims,

- 19 -

seek to invite the Court to "reweigh [any] conflicting evidence or otherwise [] substitute [its] judgment for that of the agency." *Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995) ("IMPA"). However, the Supreme Court has cautioned that, on questions related to foreign policy, "'the lack of competence on the part of the courts is marked.'" *Hawaii*, 585 U.S. at 704 (citation omitted). On such ground, the Court should reject this invitation.

> i.  *The Pause Operates Through, and Is in Accordance with, the INA.*

In all events, turning to the merits, Plaintiffs' argument that the Pause is not in accordance with law fails because the Pause does not, as Plaintiffs allege, replace the statutory mechanism governing visa adjudications or alter the role Congress assigned to consular officers, but rather operates within the INA's existing framework for individualized visa determinations and is authorized by the Secretary's express statutory authority under 8 U.S.C. § 1104(a).

As discussed above, the INA establishes a detailed statutory scheme governing visa adjudication, inadmissibility determinations, and immigrant visa issuance. Congress vested the Secretary of State with broad authority over visa administration: § 1104(a) provides that the Secretary "shall be charged with the administration and the enforcement of the provisions of this Act and all other immigration and nationality laws relating to . . . the powers, duties and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas" and that the Secretary "shall . . . issue such instructions, and perform such other acts as he deems necessary for carrying out such provisions."  The Secretary has authority to supervise, direct, and coordinate the visa adjudication process—including through policy directives to consular officers—while preserving the consular officer's statutory role in individual cases.

- 20 -

Under that scheme, whenever a visa application is made, the burden is on the visa applicant to establish eligibility for a visa to the satisfaction of the consular officer, and only a consular officer may issue a visa. 8 U.S.C. § 1361; 8 U.S.C. § 1201(a). A consular officer's authority to issue visas is not unfettered, but rather is constrained by visa ineligibility grounds, and § 221(g), which mandates that consular officers refuse visas when it appears that the applicant is ineligible under the law. 8 U.S.C. § 1201(g). Consular officers exercise their judgement in each case to determine whether an applicant has established visa eligibility to the satisfaction of the consular officer. 8 U.S.C. § 1361. Moreover, consular officers are prescribed substantive criteria to consider in exercising such judgment: e.g., § 212(a)(4) renders inadmissible any alien who, "in the opinion of the consular officer," is likely to become a public charge, as determined by consideration of enumerated factors.

The Pause, as evidenced by the Directive, tracks that statutory structure and falls within the Secretary's § 104(a) authority. The Directive instructs officers to refuse visas per § 221(g). The legal consequence—a refusal—flows only if the officer applies § 221(g) in a specific adjudication. Nothing in the Directive authorizes issuance or denial outside that statutory mechanism.

Likewise, § 212(a)(4)'s reference to "the opinion of the consular officer" presupposes discretionary judgment exercised within an executive hierarchy. 8 U.S.C. § 1182(a)(4)(A). Nothing in § 212(a)(4) or § 221(g) requires atomized adjudication insulated from supervisory guidance. Indeed, § 104(a)'s express grant of administrative authority to the Secretary would be meaningless if consular officers operated entirely independently of departmental policy. What the statute requires is that the legal act of issuance or refusal be performed by a consular officer

- 21 -

applying statutory standards. Consular officers continue to make § 221(g) refusal determinations in accordance with the Directive's instructions.

Plaintiffs' theory—that executive-level guidance negates individualized adjudication—misconstrues the statutory framework and does not account for § 104(a)'s delegation of administrative and enforcement authority to the Secretary and adjudicatory authority to consular officers. The INA requires that refusals be entered by a consular officer applying statutory criteria in a particular case. That remains true notwithstanding the Directive.  So long as the governing standards are Congress's standards and the issuance or refusal remains the consular officer's act, the congressionally prescribed framework remains intact. That is the case here.

As discussed above, *Muñoz* underscores that courts must respect the political branches' primacy in admission decisions and refrain from intruding into the Executive's implementation of congressionally prescribed standards.  602 U.S. at 907–08.  Plaintiffs' structural theory would invert that allocation by treating internal executive coordination as a statutory violation. But the INA assigns visa implementation to the Executive, specifically vesting the Secretary with administrative and enforcement authority under § 104(a), and Congress specified the operative mechanism: individualized adjudications culminating in a decision, including refusal under § 221(g).

Section 1152(a)(1)(A) does not alter that analysis. It regulates discrimination "in the issuance" of immigrant visas, and does not repeal inadmissibility grounds, displace §212(a), or modify § 221(g). 8 U.S.C. § 1152(a)(1)(A). Reading it to forbid executive coordination of visa processing would conflict with Congress's express delegation of visa authority to the Executive and its specification that issuance and refusal occur through consular adjudication under § 221(g).

- 22 -

> ii. *The Pause Is Otherwise Consistent with State's Obligations Under the APA.*

Plaintiffs' remaining arguments under this count similarly fail. First, even more than the others, Plaintiffs admittedly challenge State's policy and "seek prospective, case-specific relief to prevent application of an unlawful outcome-determinative nationality bar[]" Mot. at 5. This argument simply invites the Court to "reweigh [any] conflicting evidence or otherwise substitute [its] judgment for that of the agency," *IMPA*, 56 F. 3d at 254, in an area where courts are "ill equipped" to review evidence. *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 491 (1999). Again, the Court should reject this invitation.

Plaintiffs' argument that, in effectuating the Pause, Defendants impose a "nationality-based suspension of immigrant visas" functioning "as an unlawful categorical bar," again misconstrues the statutory framework. Compl. ¶ 22. Under the guidance in the Directive, consular officers, consistent with the INA, continue to make determinations of inadmissibility under § 212(a) and enter refusals through § 221(g). Accordingly, this claim should be dismissed.

### 3. Plaintiffs' Ultra Vires Claim (Count II), Fails.

Plaintiffs contend that the Pause is ultra vires "because it exceeds the statutory authority." Mot. at 5; see also Compl. ¶ 18. Plaintiffs are mistaken. The reviewing standard for an ultra vires claim is necessarily narrow. *Leedom v. Kyne*, 358 U.S. 184 (1958) (underscoring its exceptionalness). Under *Leedom*, ultra vires review applies only where an agency has contravened a clear statutory command—where Congress has said "shall not," and the agency has done precisely what the statute forbids. *See id*. 185-88 (permitting review because the National Labor Relations Board disregarded an expressed statutory prohibition when it certified a bargaining unit that, without a vote, included professional employees).

- 23 -

Courts repeatedly have emphasized that *Leedom* applies only in extremely limited situations where an agency has violated a clear statutory command, not where, as here, a plaintiff merely disputes the agency's application of a statute. *Fed. Express Corp. v. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) ("ultra vires claims are confined to 'extreme' agency error where the agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]' Only error that is 'patently a misconstruction of the Act,' that 'disregard[s] a specific and unambiguous statutory directive,' or that 'violate[s] some specific command of a statute" will support relief.'" (internal citations omitted)). It does not authorize courts to supervise ordinary exercises of delegated discretion or to second-guess how the Executive implements a statutory framework.

*Leedom* has no place here. Plaintiffs do not identify any statutory text providing that the Executive "shall not" issue guidance regarding visa processing, "shall not" coordinate public charge determinations, or "shall not" require refusals to be entered under § 221(g) pending additional processing. To the contrary, § 221(g) expressly provides that "no visa . . . shall be issued" if "it appears to the consular officer" that the applicant is ineligible. Section 212(a)(4) renders inadmissible any alien who, "in the opinion of the consular officer," is "likely" to become a public charge. And § 104(a) provides the Secretary with broad administrative and enforcement authority. As discussed above, the challenged framework operates through those provisions.

Plaintiffs here challenge how the Executive administers concededly applicable statutory provisions. That is a disagreement with the manner in which delegated authority is exercised, not a claim that the Executive has acted in defiance of a statutory prohibition. Plaintiffs therefore cannot satisfy the narrow ultra vires standard. This Court should dismiss this claim.

- 24 -

4.    The Alleged Violation of 5 U.S.C. § 706(2)(D) (Count IV) Fails.

Plaintiffs contend that the Pause is a legislative rule that Defendants implemented without notice and comment, in violation of the APA, 5 U.S.C. § 706(2)(D).  Compl. ¶¶ 59-60.  However, the Pause is not a legislative rule; and, even if it were a legislative rule, the foreign affairs exception would apply. This allegation fails.

First, the Pause is plainly not a legislative rule.  Under the APA, legislative rules must generally be promulgated through notice-and-comment rulemaking.  *See* 5 U.S.C. § 553.  Non-legislative rules—i.e., "interpretative rules, general statements of policy, [and] rules of agency organization, procedure, or practice"—in contrast, need not go through notice and comment.  *Id*. § 553(b)(A).  The central issue in distinguishing between a legislative and non-legislative rule is whether the rule has "the force of law"—i.e., whether the agency "needs" the rule "to provide a basis for enforcement actions or agency decisions conferring benefits" (a legislative rule) or does not (a non-legislative rule).  *Am. Min. Congress v. Mine Safety & Health Admin*., 995 F.2d 1106, 1110 (D.C. Cir. 1993).  In making such determination, courts ask: (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations [C.F.R], (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.  *Id*. at 1112.  "If the answer to any of these . . . is affirmative, we have a legislative . . . rule." *Id*.

Here, State does not "need" the Pause "to provide a basis for enforcement actions or agency decisions conferring benefits" and the answer to each of the these questions is no. As discussed, the Pause operates within the INA framework, with consular officers continuing to conduct interviews, fully assess applicants, and render eligibility determinations, and with officer judgment

- 25 -

remaining the statutory trigger for legal consequence. The Pause is necessarily "not finally determinative of . . . rights," *Guardian Fed. Sav. & Loan Ass'n v. Fed. Save. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978); rather, the INA remains so determinative.

Instead, the Pause is more appropriately viewed as a "general statement of policy," 5 U.S.C. § 553(b)(A), because it was "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Am. Min. Congress*, 995 F.2d at 1109 (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)). As described above, the Pause, in providing prospective direction to consular officers on the exercise of their discretionary power, fits under such category. *Clarian Health West, LLC v. Hargan* is instructive. 878 F.3d 346 (D.C. Cir. 2017). There, the D.C. Circuit considered whether HHS instructions on selecting hospitals for recalculation of their Medicare payment claims were a general statement of policy or a legislative rule. *Id*. at 349. The court noted that the instructions "merely explain[] how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion," and that any legal effects on providers allegedly flowing from the instructions, in fact, "stem[med] from the Medicare Act and its implementing regulations as well as the reconciliation actions taken pursuant to those authorities." *Id*. at 357-358. Accordingly, the court held that the instructions were a general statement of policy, and were exempt from notice-and-comment requirements. *Id*. at 357-58. As discussed above, so, too, here—the Pause operates within the INA statutory framework, and any legal effects allegedly flowing from the Pause, in fact, stem from the INA.

Second, even if the Pause were a legislative rule, the foreign affairs exception would apply to it. *See* 5 U.S.C. § 553(a)(1) (no notice-and-comment requirements "to the extent there is involved . . . a military or foreign affairs function of the United States"). This exception covers

- 26 -

agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). "The purpose of the [exception] was to allow more cautious and sensitive consideration of those matters which so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences." *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010) (internal quotations and citations omitted). "[I]t would seem clear that the exception must be construed as applicable to most functions of the State Department[.]" Attorney General's Manual on the Administrative Procedure Act 27 (1947).

"[T]he law on the contours of the foreign affairs . . . exception is largely undeveloped" and "[t]here is sparse case law in—or outside—this Circuit construing" it. *E.B. v. Dep't of State*, 2023 WL 6141673, at *3 (D.D.C. Sept. 20, 2023). Several Circuit courts have applied the exception where notice and comment "would provoke definitely undesirable international consequences." *Am. Ass'n of Exps.*, 751 F.2d at 1249 (quoting the APA's legislative history); *see also Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008); *Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983); *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). Relatedly, several Circuit courts, and at least one recent court in this District, have found the exception to apply in reviewing legislative rules governing immigration. *See Nademi v. INS*, 679 F.2d 811 (10th Cir. 1982) (legislative rule affecting Iranian nationals enacted in response to 1979–80 Iranian hostage crisis); *Malek–Marzban v. INS*, 653 F.2d 113 (4th Cir. 1981) (same); *Yassini*, 618 F.2d at 1356 (same); *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018). While the D.C. Circuit has not itself considered the scope of the exception, courts in this District have stated that "a rule must clearly and directly involve activities or actions characteristic to the conduct of international relations" for

- 27 -

the exception to apply.  *E.B. v. Dep't of State*, 583 F. Supp. 3d 58, 64 (D.D.C. 2022); *see also Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 52 (D.D.C. 2020) (same).

Here, to the extent the Pause is a legislative rule, it properly falls within the foreign affairs exception. The Pause concerns the admissibility of visa applicants from a specified list of countries.  Def. Mot. Ex. A.  The selection of those countries was explicitly based, in part, on foreign policy considerations, *see id*. ¶ 8, and submitting the Pause, and the decision as to the nationals to which it applies, to notice and comment would "provoke definitely undesirable international consequences."  Further, the Pause itself clearly and directly involves "activities or actions characteristic to the conduct of international relations"—the selection of the countries whose nationals are subject to it inherently implicates international relations.

State's invocation of the foreign affairs exception is adequately supported. In *Raoof v. Sullivan*, the Department promulgated, without notice and comment, a rule that subjected the family of J-1 nonimmigrant exchange visitors to the same two-year foreign residency requirement that applies to the primary J-1 visa holder.  315 F. Supp. 3d 34, 43-44 (D.D.C. 2018).  The court found that the foreign affairs exception applied because the rule "relates to the foreign affairs and diplomatic duties conferred upon the Secretary of State and the State Department."  *Id*. So, too, here.  In setting out countries whose nationals are subject to a pause on the issuance of immigrant visas, the Pause clearly relates to State's consular and diplomatic duties.

Accordingly, because the Pause is not a legislative rule, and, to the extent it is a legislative rule, is subject to the foreign affairs exception, this claim should be dismissed.

### 5.   The Alleged Violation of the INA (Count I) Also Fails.

In their motion and Complaint, Plaintiffs cite 8 U.S.C. § 1152(a)(1)(A) for the proposition that the Pause withholds the issuance of immigrant visas based upon national origin in direct

violation of the INA's non-discrimination clause.  Compl. ¶¶ 53-54.  However, Plaintiffs lack a freestanding cause of action under the INA for this count, and, thus, it cannot succeed.  *Alexander v. Sandoval* held that private rights of action must be created by Congress and cannot be inferred absent "rights-creating language" and clear congressional intent. 532 U.S. 275, 286-88 (2001). The judicial task is "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Id*. at 286.  The lack of an express remedy is not merely a gap for courts to fill; rather, "[s]tatutory intent on this latter point is determinative."  *Id*.  If Congress has not manifested such intent, "a cause of action does not exist and courts may not create one."  *Id*. at 286–87.

In *Gonzaga Univ. v. Doe*, the Court reiterated that, to support a private suit, a statute must "unambiguously confer" an individual right. 536 U.S. 273, 281-84 (2002). It is not enough that a statute benefits a class of persons or regulates government conduct. The statute must contain rights-creating language "phrased in terms of the persons benefited" and manifest a clear congressional intent to permit private enforcement. Id. at 285. Absent such text, courts may not imply a remedy.

Here, Plaintiffs cannot point to any language in § 1152(a)(1)(A) that "unambiguously confer[s]" an individual right to judicial enforcement. Section 1152(a)(1)(A) regulates executive conduct in the issuance of immigrant visas; it provides that "no person shall . . . be discriminated against in the issuance of an immigrant visa because of" specified characteristics. 8 U.S.C. § 1152(a)(1)(A). But it does not contain language conferring a right to sue, authorizing a private action, or specifying a judicial remedy; it does not unambiguously confer an individually enforceable right within the meaning of *Sandoval* and *Gonzaga*. Nor does the broader INA supply a freestanding cause of action authorizing private parties to challenge internal visa-processing guidance divorced from a specific statutory review provision.  In contesting otherwise by asserting

- 29 -

this count, Plaintiffs ask the Court to infer a private remedy directly from the statute's prohibition on discrimination in visa issuance.  But, under *Sandoval* and *Gonzaga*, that is insufficient.  And those limits apply with particular force in the immigration context, where Congress's authority is broad and judicial review is constrained.  *Fiallo v. Bell*, 430 U.S. 787, 792, 793 n.5 (1977).

The absence of rights-creating language and the INA's comprehensive structure foreclose judicial creation of a new cause of action; accordingly, Plaintiffs cannot succeed on this count.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice.

Dated: May 14, 2026
      Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By:        */s/ Amanda L. Torres*
     AMANDA L. TORRES
     D.C. Bar # 1562702
     Assistant United States Attorney
     601 D Street, NW
     Washington, DC 20530
     (202) 252-2507 (office)

*Attorneys for the United States of America*